IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| CECELI E.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:21-cv-00008 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:    Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Ceceli E. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decisions denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the

applicable law, I cannot find that the decision is supported by substantial evidence. Accordingly,

I respectfully recommend that the decision be reversed and the case be remanded under the

fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. *See* 42
U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[3] Social Security ALJs follow a

five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence,

whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration

requirement; (3) has an impairment that meets or equals an impairment listed in the Act's

regulations; (4) can return to his or her past relevant work based on his or her residual functional

capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*,

858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not

disabled. *See id.*

## II. Procedural History

Ceceli applied for DIB and SSI in December 2013. Administrative Record ("R.") 204–

05, 211–17. She alleged disability beginning on April 6, 2013, R. 204, 211, because of bulged

disc in the lower back, double vision in the right eye, right elbow fracture, right hip fracture,

right leg problems, migraines, depression, and bad memory, R. 235. Disability Determination

Services ("DDS"), the state agency, denied both claims initially in June 2014, R. 71–90, and

upon reconsideration that November, R. 91–108, 110–27, 129–30. In July 2016, Ceceli appeared

with counsel and testified at an administrative hearing before ALJ Susan G. Smith. *See* R. 40–70.

ALJ Smith issued an unfavorable decision in September 2016. *See* R. 25–34. The

Appeals Council declined to review that decision, R. 1–6, and in September 2017, Ceceli filed an

action in this Court contesting ALJ Smith's decision, R. 1000–01. The Commissioner filed a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the
date of the ALJ's written decision.

motion for sentence-four remand in that case, which this Court granted on April 17, 2018. *See* R. 1003–08. *See* 42 U.S.C. § 405(g) (sentence four). In January 2018, Ceceli filed a new claim for DIB benefits. *See* R. 1022. In May 2018, the Appeals Council consolidated Ceceli's claims and remanded the case to another ALJ. R. 1020–22. In October 2019, Ceceli appeared with counsel and testified at an administrative hearing before ALJ Deborah Foresman. *See* R. 933–72. A vocational expert ("VE") also testified at the hearing. *See* R. 960–71.

ALJ Foresman issued an unfavorable decision on August 26, 2020. *See* R. 901–24. She found that Ceceli had not engaged in substantial gainful activity since April 6, 2013, and that she met the Act's insured-status requirements through December 31, 2015.[4] R. 905. . Ceceli suffered from the following "severe" medically determinable impairments:

> multiple motor vehicle accident related injuries (from April 2013) including a right non-displaced acetabular fracture, a right fibular fracture, a left pelvic ring injury status-post open-reduction internal fixation, status-post a right elbow arthrotomy procedure, a head injury and eye injuries including right third nerve and fourth nerve palsy.

*Id.* (internal citations omitted). Ceceli's remaining alleged impairments, including anxiety, personality disorder, bipolar disorder, post-traumatic stress disorder ("PTSD"), and depression, were "non-severe" medically determinable impairments. *Id.* In finding Ceceli's alleged mental impairments "non-severe," ALJ Foresman evaluated the four broad areas of mental functioning known as the "paragraph B" criteria. R. 905–07. She found that Ceceli had "no limitation" in understanding, remembering, or applying information; interacting with others; concentrating,

---

[4] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [Ceceli] must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 655–56. Her insured-status is not relevant to the SSI claim. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014); 20 C.F.R. §§ 416.202, 416.501.

persisting, or maintaining pace; and adapting and managing oneself. R. 906–07. None of Ceceli's

"severe" impairments met or medically equaled any relevant Listing. R. 907–08.

ALJ Foresman then evaluated Ceceli's residual functional capacity ("RFC") and

determined that she could perform "light"[5] work except that she could only occasionally use

ramps and stairs, balance, kneel, crouch, and crawl; and could never use ladders, ropes, or

scaffolds. R. 908. Ceceli had no past relevant work but based on the RFC finding and the VE's

testimony, ALJ Foresman found that Ceceli could perform the requirements of certain "light"

unskilled jobs existing in the national economy, including cafeteria attendant, cashier, and router.

R. 923 (citing R. 961–62). Thus, ALJ Foresman concluded that Ceceli was "not disabled" at any

time from April 2013, through August 2020. *See* R. 924. Ceceli filed exceptions to that decision

in November 2020. R. 1148–49. The Appeals Council declined to "assume jurisdiction" over the

ALJ's decision, R. 891–94, and this appeal followed.

### III. Discussion

Ceceli raises several arguments contesting ALJ Foresman's decision. *See generally* Pl.'s

Br., ECF No. 16. She asserts that ALJ Foresman improperly evaluated the medical opinion

evidence of record and erroneously found that her mental impairments were "non-severe." *Id.* at

10–20. Next, Ceceli contends that the ALJ erred in finding that she had no mental limitations

after her alleged onset date ("AOD") and in finding that she was not disabled for any consecutive

twelve-month period after her AOD. *Id.* at 20–22. Ceceli then argues that the ALJ failed to

account for her impairment-related limits in concentration, persistence, and pace, *id.* at 20–23,

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

failed to consider material evidence regarding her hip pain, *id.* at 23–26, and made a legally

deficient finding at step one of the two-step pain analysis set forth by *Craig v. Chater*, 76 F.3d

585 (4th Cir. 1996), *id.* at 26–28.

The period under adjudication in this claim spans more than seven years, from Ceceli's

AOD—April 6, 2013—until ALJ Foresman's decision denying her claims—August 26, 2020.

*See* R. 1020–22. Ceceli concedes that over the course of this period, her psychological condition

"improved to some degree." Pl.'s Br. 21. Nonetheless, the overarching theme of Ceceli's

arguments is that in discrediting several medical opinions of record, and in finding her mental

impairments "non-severe," the ALJ relied solely on evidence representing her improved state,

while overlooking evidence of significant mental impairment and limitations from an earlier

period. *Id.* at 20 ("She simply ignored the difference between the 'then' and the 'now.'"); *see*

*also id.* at 21–22 ("The ALJ continually used the present tense, indicating that her decision

addressed [Ceceli's] *current* condition."). Put differently, Ceceli argues that the ALJ failed to

consider whether the evidence supported a finding that she was entitled to a closed period of

disability. *See generally Puryear v. Comm'r of Soc. Sec.*, No. 4:14cv57, 2016 WL 462822, at *6

(W.D. Va. Jan. 5, 2016).

With respect to ALJ Foreman's evaluation of the October 2014 Medical Source

Statement ("MSS") completed by Christopher Cousins, Ph.D.., and her finding that Ceceli had

no "severe" mental impairments at any point during the relevant period, Ceceli's arguments are

persuasive. Because reversal and remand are warranted on these issues, the Court will focus on

the arguments and evidence relevant to Ceceli's mental impairments.

A.    *Summary*

    1.    *Relevant Medical & Opinion Evidence*

In April 2013, Ceceli was struck by an automobile while walking along the highway. R. 308. Upon her arrival to DukeHealth, she was noted to have the following injuries: a left hemopneumothorax, an open right elbow, left APC-2 pelvis, a right acetabular fracture, bilateral fibular fractures, a blown right pupil, and an altered mental status. *Id.* Ceceli used a wheelchair for several months after the accident, *see* R. 641, 669–70, and she continued to complain of lasting physical impairments throughout the relevant period, *see, e.g.*, R. 641, 549, 711, 745, 808, 833, 1390, 1380, 1360, 1564.

In June 2014, Ceceli began attending individual therapy with social worker Jane Rose. *See* R. 1969–78. She reported having the "wors[t] life ever" and being unable to work since her accident. R. 1970. A mental status examination revealed good orientation, logical and goal-directed thought processes, crying episodes, irritability, extreme worrying, high anxiety, and "mild" suicidal ideation. *Id.*; *see also* R. 1967–68. In July, Ceceli was prescribed Fluoxetine. R. 1965. Ceceli reported to Rose that she had an "anger control problem," she did not want to be around others, and she said she had stabbed her oldest son's father and cut her youngest son's father. R. 1964. On exam, Ceceli was oriented to person, place, time, and situation, and she displayed disorganized speech, depressed and anxious mood, goal-directed thought process, and relevant thought content. *Id.*

During a session in August, Ceceli reported depression and worry. R. 1961. She had "threatened to overdose and took two pills [before her] boyfriend stopped her." *Id.* Examination revealed good orientation, lucid speech, appropriate mood, goal-directed thought process, and relevant thought content. *Id.* Later in August, Ceceli presented to Halifax Primary Care for a three-week follow up after having started Prozac for her depression and anxiety. R. 584. She reported some improvement from Prozac but was still "very angry." *Id.* On exam, Ceceli was

7

well-appearing, alert and oriented, and seemed nervous. R. 585–86. Beena Patel, D.O., assessed

feeling angry, acute, moderate; and adjustment disorder with depressed mood, chronic, not

controlled; and he increased Ceceli's Prozac dosage and instructed that she could use Xanax

sparingly "if needed for increased anxiety/anger." R. 587; *see also* R. 1506 (alert and oriented,

disheveled poorly kept habitus, flat affect, and depressed appearance during hospital visit for leg

pain).

In September, Rose completed a Mental Status Assessment form regarding Ceceli's

conditions. R. 602–03. Ceceli had disheveled appearance, good orientation, and a flat and angry

affect, and she was confused at times, disorganized, and often forgot appointments or showed up

late. R. 602. Rose described Ceceli's mood as labile, said she was often emotional, angry,

frustrated, and irritable, and she noted a poor fund of information, poor coping skills, and normal

speech. *Id.* Ceceli admitted to homicidal ideation with no plan and to suicidal ideation, stating

she had attempted two to three overdoses and cut herself in the past. *Id.* Rose's diagnoses

included major depressive episode, recurrent, severe; generalized anxiety disorder; and

personality disorder. R. 603. Rose recommended that Ceceli continue treatment to improve her

coping skills and "continue to remain stable in the community." *Id.*

On September 23, Ceceli saw Dr. Patel for a follow-up regarding her anxiety and

depression, and she reported that she had stopped taking Prozac because it was not helping. R.

1402. She seemed nervous on exam, but all other findings were normal. R. 1404. Dr. Patel

assessed adjustment disorder with depressed mood, chronic, not controlled, and he advised

Ceceli to continue to stay active. *Id.*; *see also* R. 1954–55 (reporting suicidal plan) (Sept. 24,

2014). A week later, a social worker conducted a psychiatric assessment and noted that Ceceli

had average insight, judgment, fund of information, and abstract thinking; intact memory; and

suicidal ideation and thoughts of harming others with no specific plan. R. 610 ("My children keep[] me here. I don't want to hurt them."). Psychotic-like behaviors included flight of ideas; hallucinations; withdrawn, loose associations; wanders off; confusion; and forgetfulness. *Id.* She had an appropriate affect, appropriate and guarded attitude, no antisocial behaviors, and her depressive-like behaviors included sadness, fatigue, anhedonia, feelings of worthlessness and guilt, crying, and poor concentration. *Id.* The social worker diagnosed Ceceli with major depressive disorder and rule out PTSD, *id.*, and recommended outpatient mental health and psychiatry services, R. 611.

Ceceli continued to report depression to Rose in October, R. 1953, and exam findings noted good orientation, lucid speech, appropriate mood, goal-directed thought process, and relevant thought content. *Id.* Also in October, Ceceli presented to DukeHealth complaining of generalized pain, headaches, and a poor memory. R. 810. She was taking amitriptyline as needed, R. 810–11; appeared depressed, R. 811; and "endorse[d] thoughts that she would be better off dead but denie[d] any specific or any real thoughts of hurting herself," *id*. On exam, she was alert and oriented; her recent and remote memory, attention span, and concentration were intact; and she displayed flat affect, normal speech and thought processes, and appropriate eye contact. R. 814. The attending physician recommended continued therapy for her mental health issues. R. 815.

On October 20, Ceceli was involuntarily admitted to Poplar Springs Hospital for seven days for stabilization of suicidal thoughts. R. 616 (indicating admission by "TDO," or temporary detention order). She reported decreased sleep, financial struggles, and increased suicidal thoughts. *Id.* On discharge, her condition was "[m]uch improved," and she no longer had suicidal thoughts. R. 617. The discharging physician's prognosis was "[f]air if she keeps her

appointments," and he said that Ceceli was "disabled due to her chronic pain issues and mental health issues, unable to work at this time." *Id.* The physician diagnosed major depressive disorder, recurrent, severe, without psychotic features; PTSD; marijuana abuse; chronic pain problems; and hypertension, R. 617–18, and prescribed Seroquel, Depakote, Effexor, and Klonopin, R. 617.

On October 29, 2014, Dr. Cousins performed a consultative mental status evaluation of Ceceli. R. 620. Ceceli reported that she had suffered from depression since 2008 when she said her oldest son's father was stabbed to death while she was on the phone with him. R. 620, 624. Ceceli was noted to be cooperative and to exhibit a polite demeanor throughout the evaluation, her speech was rapid, and she was "very talkative, often to the point of being tangential with her responses." R. 623. Her mood, affect, and facial expressions were normal, rapport was easily established, and her leg shook in a restless manner on one occasion. *Id.* Her thought content was reality-based, she denied current suicidal or homicidal ideation, and she had good orientation, fair immediate memory, poor recent memory, good remote memory, fair general fund of information, and good calculation ability. *Id.* Ceceli's abstract thinking ability appeared fair to good, and her judgment, common sense, and reasoning abilities appeared fair. R. 624. Dr. Cousins diagnosed unspecified bipolar disorder and rule out borderline personality disorder. *Id.* He noted no evidence of malingering. *Id.*

Dr. Cousins completed an MSS regarding Ceceli's functional abilities. He opined that Ceceli appeared capable of performing simple and repetitive tasks, but that "[d]ue to her emotional state, she would likely have difficulty with detailed and complex tasks." R. 625. She did "not appear to [have] any cognitive deficits to suggest that she would require special instructions or additional supervision." *Id.* "Due to her mood disorder, Ceceli would likely have

10

difficulties maintaining regular attendance in the workplace, performing work activities on a consistent basis, and completing a normal workday or workweek without interruption." *Id.* Given Ceceli's apparent "history of mood lability, irritability, and low frustration tolerance," Dr. Cousins "expected [her to] have difficulties accepting instructions from a supervisor and interacting appropriately with coworkers and the public." *Id.* Lastly, Ceceli would "have significant difficulty coping with the typical stressors encountered in competitive work."[6] *Id.*

In November, Ceceli underwent a psychiatric evaluation with Joseph Mason, M.D. R. 1305. A mental status exam revealed cooperative attitude, good eye contact, "generally" linear and logical and "very" goal directed thought processes, fair insight, and no suicidal or homicidal ideation. R. 1306. Dr. Mason noted that Ceceli presented as if she had "rehearsed the story that she gave" and "seemed to embellish the role of victim," and he "g[o]t the sense that she magnifie[d] symptoms in hopes of getting disability." *Id.* He increased her Effexor dosage, continued her on Depakote and Seroquel, and decreased her Klonopin dosage. R. 1307. When Ceceli saw Rose in December, an examination revealed good orientation, disorganized speech, depressed and anxious mood, loose thought process, and expansive thought content. R. 1961.

At a February 2015 visit with Dr. Patel, Ceceli reported depression and anxiety, R. 1396–97, and she seemed nervous on exam, but was alert and oriented. R. 1398. In April, Ceceli again reported depression to Rose and said that she had been isolating herself. R. 1949. Examination revealed good orientation, disorganized speech, depressed and anxious mood, goal-directed thought process, and relevant thought content. *Id.* Ceceli continued to report anger and

---

[6] In July 2018, Dr. Cousins performed a second consultative mental status evaluation of Ceceli, and he offered another MSS wherein he opined that Ceceli suffered from the same limitations contained in his October 2014 MSS. R. 1286–90. He also completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)," wherein he indicated that Ceceli suffered from similar limitations as those offered in both his October 2014 MSS and July 2018 MSS. R. 1292–94.

depression to Rose in June, saying that she had gotten mad and broken a window in her bedroom. R. 1948. Examination revealed good orientation, disorganized speech, depressed and anxious mood, coherent thought process, and relevant thought content. *Id.*

Later in June, the police brought Ceceli to the emergency department ("ED") at Halifax Regional Hospital at her request after she was involved in a fight, and she reported feeling anger towards her family, her boyfriend, and her boyfriend's mother. R. 1489–90. She said that she wanted to "slap some people, particularly her boyfriend's mother," *id.*, and she expressed that she had suicidal thoughts but no real plan and that she had stopped taking her medications, R. 1491. Exam findings were normal. R. 1492. The attending physician diagnosed suicidal thoughts, *id.*, noted that Ceceli did not meet the criteria for hospitalization, referred her to community support services, R. 1489, and discharged her in improved condition, R. 1493.

In July 2016, John Gergen, M.D., filled out a "Mental Residual Functional Capacity Statement" on Ceceli's mental abilities. R. 887–90; *see* R. 901 (ALJ Foresman noting that the Appeals Council's remand order directed her to further develop Ceceli's record, which "should include requesting records from Dr. Gergen and LCSW Rose"). He indicated he had treated Ceceli monthly, and his diagnoses included intermittent explosive disorder, depressive disorder, anxiety disorder, mild cognitive impairment, attention deficit disorder, and PTSD. R. 887. The form listed several specific areas relating to Ceceli's abilities in understanding and memory, sustained concentration and memory, social interaction, and adaptation. R. 888–89. In all but one of these areas, Dr. Gergen opined that Ceceli's mental limitations were either a Category III[7] or

---

[7] "Category III" is defined in the Mental Residual Functional Capacity Assessment as "[p]reclud[ing] performance for 10% or an 8-hour work day." *Id.*

Category IV,[8] indicating that her diagnosed mental impairments would significantly affect her ability to participate in competitive employment. *Id.* He also found that she would be "off-task" more than 30% of an eight-hour workday, she would miss five days or more of work per month, she would be unable to complete an eight-hour workday five days or more a month, and she could be expected to perform 50% less efficiently than the average worker on a sustained basis for eight hours a day, five days a week. *Id.* Dr. Gergen found that Ceceli would not be able to sustain competitive employment for at least six months. R. 890. Dr. Gergen checked a box indicating that Ceceli's impairments, symptoms, and limitations had "probably" lasted since the date she claimed "she could no longer work," but the form did not identify that date. R. 887.

In September, Ceceli presented to the ED at Halifax Regional Hospital for a psychiatric evaluation. R. 1446. She was brought in by her family and expressed suicidal and homicidal ideation, and she was "threatening others, stating she wanted to 'kill some people' per report." R. 1448. It was noted that she had "attempted to jump out of a moving vehicle on the way to hospital." R. 1446 (cleaned up). On exam, Ceceli was alert and oriented, had a normal attention span and normal fund of knowledge, appeared depressed and anxious, and was "quite agitated." R. 1449. The attending physician diagnosed suicidal thoughts and depressive disorder and prescribed Lorazepam. *Id.* Ceceli was transferred to Pavilion Hospital in Williamsburg, Virginia, R. 1453, where she received inpatient behavior health services from September 28 until October 5, R. 1901–47. A mental status exam revealed depressed, angry, and irritated mood; depressed affect; coherent, relevant, and goal-directed thought process; hopeless, helpless, and worthless feelings; suicidal thoughts; no homicidal thoughts; good orientation; good recent, remote, and

---

[8] "Category IV" is defined in the Mental Residual Functional Capacity Assessment as "[p]reclud[ing] performance for 15% or more of an 8-hour work day." R. 887.

immediate memory; fair insight; and poor judgment. R. 1918–19. During a mental status assessment on the date of her discharge, Ceceli was noted to be cooperative, coherent, and relevant, to have goal-directed conversation, no suicidal or homicidal thoughts, good orientation and insight and judgment, and her immediate, recent, and remote memory were all good. R. 1932. She was diagnosed with bipolar disorder, cannabis use disorder, and PTSD. R. 1904. The attending physician prescribed Geodon, instructed her to take her other medications—Prazosin, Xanax, Depakote, and Prozac—and noted that Ceceli "ha[d] no anger, rage or any aggressive behavior." *Id.*

In November, Ceceli had a mental health assessment and reported anger issues and said she felt overwhelmed, hopeless, and financially unstable. R. 1313. A mental status exam found good insight, judgment, fund of information, and abstract thinking; intact memory; no danger to self or others; appropriate affect and attitude; no antisocial behavior; and sadness, fatigue, anhedonia, feelings of worthlessness, and poor concentration. The attending medical provider diagnosed dependent personality disorder; major depressive disorder, recurrent, severe; and general disability. R. 1318. Later in November, Ceceli again presented to the ED at Halifax Regional Hospital, reporting suicidal thoughts for one week and stating that she "want[ed] to overdose on her medications and stab some other people." R. 1440. She was in no apparent distress and was alert, appropriate, and anxious on exam, and she displayed a generally well-kept habitus, good orientation, flat affect, and depressed appearance. R. 1440–41. Ceceli was diagnosed with depressive disorder, suicidal thoughts, and homicidal thoughts, R. 1441, and was transferred to a psychiatric facility, R. 1445. At a psychiatric evaluation in December, Ceceli reported that she had been off her medications for two and a half weeks before her November hospitalization, and she reported that after starting her medications again she "fe[lt] better

14

although she ha[d] low energy." R. 1323. She denied suicidal or homicidal ideation and she said

her crying episodes and feelings of hopelessness had subsided. *Id.* A mental status exam revealed

normal speech, better mood, mood-congruent and euthymic affect, fairly logical, linear and

organized thought processes, no suicidal or homicidal ideation, and fair insight and judgment,

and she was alert and oriented. R. 1325. Nathan Geeta, M.D., diagnosed major depressive

disorder, instructed Ceceli not to consume alcohol or drugs or possess weapons, recommended

continuing her medications, and noted she needed substance abuse counseling. *Id.*

      In February 2017, Ceceli began reporting improvement, but said she still had occasional

negative thoughts, increased anxiety, and trouble sleeping. R. 1329. A mental status exam

revealed normal speech; better mood; mood-congruent and euthymic affect; fairly logical, linear,

and organized thought processes; no suicidal or homicidal ideation; and fair insight and

judgment; and she was alert and oriented. R. 1329. Dr. Geeta continued her on Geodon,

Prazosin, and Xanax, increased her Prozac, and prescribed Trazodone. *Id.* At an individual

counseling session with Laura Hamlette, M.S., in March, Ceceli reported that she was taking

good care of her sons and spending time with her mother and grandmother. R. 1335. She wanted

to try to obtain a driver's license and had been studying to do so. *Id.* Her mood, however, varied

from day to day. *Id.* In May, Ceceli told Dr. Geeta she had stopped taking her medications, she

had been drinking two beers a day, and she felt irritable, but she denied suicidal or homicidal

ideation. R. 1332. Dr. Geeta noted the same exam findings as from February. *Id.* Dr. Geeta

discontinued Depakote, Geodon, Prazosin, Xanax, and Trazodone, prescribed Zyprexa and

Zoloft, ordered continued therapy, and again said that Ceceli needed substance abuse counseling.

R. 1332–33.

At a therapy session with Hamlette in June, Ceceli reported that she had been "feeling a little bit better lately," she was "talking to someone and [] she ha[d] been getting up and dressed and trying to go out more lately," and she was looking for a job that did not involve prolonged standing. R. 1337. In July, when Ceceli saw Hamlette again, she "presented smiling and stated she was doing better with getting out a little more and ha[d] been talking to someone for a few weeks." R. 1339. She was frustrated that she had not been able to find a job where she did not have to stand all day, but said she was "eager to work," although she felt "limited in her employability." *Id.*; *see also* R. 1373–74 (Depression screening negative and normal cognitive assessment at annual appointment) (Aug. 28, 2017). In October, Ceceli told Hamlette she had stopped taking her medications, but she reported doing well other than some trouble sleeping. R. 1341. She still planned to get her driver's license, she had registered for classes to become a Certified Nurse's Assistant, and she continued to see the "same man she ha[d] been seeing for a few months." *Id.*

When Ceceli saw Hamlette in May, she continued to report improvement in her mood and decreased anger, and she said her boyfriend had "a calming effect on her and helps her to see things differently." R. 1353. She had gotten her driver's license and was "enjoying her freedom and independence with" it, and she wanted to go to school. *Id.*

2.    *Ceceli's Statements*

Ceceli submitted a Function Report to DDS in February 2014. R. 259–66. She reported that she did housework and cared for her two children "all day," R. 259, went back and forth up and down stairs to get around her house, *id.*, and did "everything" for her sons, R. 260. She had trouble remembering things and needed to write reminders for herself. R. 261, 264. Ceceli made simple meals and several-course meals for herself and her sons daily, and she cleaned, ironed,

and did laundry. *Id.* She shopped in stores and on the computer for household items, and she was

capable of paying bills, counting change, handling a savings account, and using a

checkbook/money orders. R. 262. Ceceli conversed, read, watched television, and went out to eat

with family and friends "daily or a couple times a month." R. 263. She could pay attention for

"as long as needed," R. 264, could follow written instructions "very good if [she] can

concentrate," *id.*, could follow spoken instructions "good" if she did not forget them, *id.*, and she

got along with authority figures "just fine," R. 265. Ceceli's mother, Ramona, submitted a Third

Party Function Report to DDS on Ceceli's behalf a few days later. R. 267–77. Ramona reported

that Ceceli's day mostly consisted of sleeping, she occasionally cooked, and cleaned, and she

cared for her two sons and woke up at 7:15 a.m. every weekday to put her eldest son on the

school bus. R. 268. Ramona also said that Ceceli would watch movies, shop, and go out to eat

with others a few times a month. R. 273. Ramona represented that Ceceli had memory

impairments, R. 274, got along "great" with authority figures, *id.*, and did not handle stress well,

R. 275.

In October 2019, Ceceli testified at an administrative hearing before ALJ Foresman. *See*

R. 933–72. Ceceli told ALJ Foresman that she worked thirty hours per week part time for Team

Nurse caring for an elderly woman and that her duties included fixing her client a light breakfast,

making sure she took her medications, and "maybe" making her bed, but she said most of her

day at the job was spent sitting. R. 945–46. She could do basic reading, R. 947, general writing,

R. 947–48, and basic math, R. 948. Her anxiety and depression had not improved and seemed to

be getting worse, and she "had a little episode at work one day." R. 949. When not working,

Ceceli spent time with her three sons, aged eleven, nine, and fourteen months. R. 956–57. She

was dating the youngest's father and they would go out to eat "[e]very now and then," R. 957.

Ceceli had taken classes and passed a test to receive her Personal Care Aide ("PCA") license, *id.*, and she would "try to get to every one" of her son's basketball and baseball games if she could. R. 960.

B.    *The ALJ's Decision*

ALJ Foresman found that Ceceli's medically determinable mental impairments of anxiety, a personality disorder, bipolar disorder, PTSD and depression were "non-severe" because they did not "cause more than minimal limitation in [Ceceli's] ability to perform basic mental work activities." R. 905; *see generally* 20 C.F.R. §§ 404.1522, 416.922 (explaining that a claimant's medical determinable impairment "is not severe if it does not significantly limit [her] physical or mental ability to do basic work activities," and that the phrase "basic work activities" means "the abilities and aptitudes necessary to do most jobs," such as "[u]nderstanding, carrying out, and remembering simple instructions," exercising judgment, "[r]esponding appropriately to supervision [and] co-workers," and "[d]ealing with changes in a routine work setting"). In assessing the severity of Ceceli's mental impairments, ALJ Foresman assessed the "paragraph B" criteria, finding that Ceceli had "no limitation" in any of the four broad areas of mental functioning. R. 905–07; *see generally* 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1) ("If we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your [mental] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.").

With respect to her finding that Ceceli had "no limitation" in understanding, remembering or applying information, the ALJ explained that Ceceli indicated that she spent "all day" doing housework and caring for her children, she did "everything" for her then three- and five-year-old children, and Ceceli's mother indicated that her household chores included

cleaning, doing laundry, and taking out the trash. R. 906. Further, Ceceli was able to attend classes, acquire, and maintain a PCA license; worked as a caregiver for an elderly woman, for whom she prepared meals, made the bed, and ensured appropriate compliance with her medications; she indicated that she could read, write, and do math; she obtained a driver's license after her AOD and drove to and from work five days a week; and she became pregnant and gave birth in 2018. *Id.* Moreover, Ceceli was the sole caregiver for her three children, had a relationship with, and went out to eat with, one of her son's fathers, prepared several-course meals daily, did the shopping for a four-person household and shopped in stores and online, and bathed her children. *Id.* Ceceli could pay bills, count change, and handle a savings account and checkbook; was good at following written and oral instructions; and could care for her personal needs. *Id.* Lastly, the medical record showed she was "repeatedly" found to be alert and oriented and that her memory was intact. *Id.*

In finding that Ceceli had no limitations in interacting with others, the ALJ noted that Ceceli indicated she had no problems getting along with family, friends, neighbors, or others; attended multiple athletic events for her two older sons; rode in cars with others; and got along "just fine" with authority figures, and her mother indicated that she woke up at 7:15 a.m. every morning and put her oldest son on the school bus. *Id.* The ALJ again noted Ceceli's pregnancy, sole caretaker status, relationship with her youngest son's father, PCA license, shopping in stores, caring for an elderly woman, and driving. *Id.* Further, the medical records "repeatedly" demonstrated that Ceceli was alert and oriented, had normal speech, made good eye contact, was cooperative and pleasant, and had good insight and judgment. R. 906–07.

ALJ Foresman found that Ceceli had no limitations in maintaining concentration, persistence, or pace because Ceceli indicated that she could pay attention for as long as needed;

19

could pay bills, count change, and handle a savings account and checkbook; watched television; was good at following written and oral instructions; and could read, write, and do math. R. 907. ALJ Foresman again relied on Ceceli's sole caregiver status, her job as a caretaker for an elderly woman, her PCA license, her obtaining a driver's license after her AOD and driving to work, attending her son's athletic events, her ability to tend to her personal needs, and her reported household chores and preparing multi-course meals.

Finally, in concluding that Ceceli had no limitations in adapting or managing oneself, ALJ Foresman again relied on Ceceli's job as a caretaker for an elderly woman, her pregnancy after her AOD, her sole caretaker status, her obtaining her driver's license and driving to work, shopping in stores, going out to eat with her boyfriend, attending her children's athletic events, and performing household chores and tending to her personal needs. *Id.* Further, the medical records showed she was alert and oriented and had good insight, judgment, and memory. *Id.*

In crafting Ceceli's RFC, ALJ Foresman evaluated the medical opinion evidence of record, including Dr. Cousins's opinions. *See* R. 918–22. She found that Dr. Cousins's determinations that Ceceli could perform simple and repetitive tasks and did not have any cognitive defects to suggest she would require special instructions or supervision were "consistent with the record as a whole," and "supported by his own findings," and thus the ALJ assigned those portions of the opinion "significant weight." R. 920.

Next, the ALJ turned to Dr. Cousins's findings that Ceceli would "likely" have difficulty with detailed and complex tasks and would "likely" have difficulties maintaining regular attendance in the workplace, performing work activities on a consistent basis, and completing a normal workday or workweek without interruptions. *Id.* She observed, "indicating that [Ceceli] would likely have restrictions indicates that [she] also may not ever have those restrictions (or

20

does not have them presently) and [Dr. Cousins] did not indicate the probability of either outcome." *Id.* She found those assertions were "vague," and that even if Dr. Cousins meant to affirmatively find that Ceceli had such limitations, his findings "would not be consistent with the record as a whole." *Id.* Thus, she assigned those portions of Dr. Cousins's October 2014 MSS "little weight." *Id.*

The ALJ then noted Dr. Cousins's findings that Ceceli would have difficulties accepting instructions from supervisors and interacting appropriately with coworkers and the public and that she would have "significant" difficulty coping with the typical stressors of competitive work. *Id.* ALJ Foresman found his opinion regarding Ceceli's ability to cope with stressors was "vague" because he did not explain how he concluded that she suffered from that limitation, and the ALJ found that both of these assertions were "highly inconsistent with the record as a whole, including the fact that [Ceceli] work[ed] 30 hours a week, obtained a driver's license after her [AOD], obtained a professional certificate by attending an in person class and care[d] for three young children including a newborn." *Id.* Further, the ALJ found these portions of the opinion inconsistent with the medical evidence "that shows [Ceceli] was repeatedly found to be alert and oriented, had intact memory and was cooperative," and she assigned those portions of the opinion "little weight." *Id.*

C.    *Analysis*

To qualify for disability benefits, a claimant need not show that she is permanently or even currently disabled at the time of the ALJ hearing. *See generally Puryear*, 2016 WL 462822, at *6 (citing *Miller v. Comm'r of Soc. Sec.*, No. 13 Civ. 6233, 2015 WL 337488, at *24 (S.D.N.Y. Jan. 26, 2015)), *adopted by* 2016 WL 492296 (W.D. Va. Feb. 4, 2016). The ALJ must evaluate whether a claimant has shown that she was disabled for any consecutive twelve-month

period between her onset date and the date of the hearing. *See id.*; *Shiplett v. Colvin*, No. 5:15cv55, 2016 WL 6783270, at *13 (W.D. Va. Nov. 16, 2016). "The disability inquiry must be made throughout the continuum that begins with the claimed onset date and ends with the hearing date, much as though the ALJ were evaluating a motion picture at every frame of the hearing." *Jennings v. Berryhill*, No. 4:15cv60, 2017 WL 1133424, at *5 (W.D. Va. Mar. 3, 2017) (quoting *Calhoun v. Colvin*, 959 F. Supp. 2d 1069, 1075 (N.D. Ill. 2013)), *adopted by* 2017 WL 1134815 (W.D. Va. Mar. 23, 2017). An ALJ's failure to consider whether a closed period of disability exists may warrant remand. *See, e.g.*, *id.*; *Reynoso v. Astrue*, No. CV 10–04604, 2011 WL 2554210, at *5–7 (C.D. Cal. June 27, 2011) (remanding for the ALJ's failure to consider whether claimant had a closed period of disability prior to undergoing surgery); *Dounley v. Comm'r of Soc. Sec. Admin.*, No. 3:08cv1388, 2009 WL 2208021, at *8–9 (N.D. Tex. July 22, 2009) (remanding with instructions to consider claimant's entitlement to a closed period where the ALJ relied on medical evidence generated after surgery that permitted the claimant to work).

Conceding that her condition improved towards the end of the relevant period, Ceceli contends that she was disabled for at least a continuous twelve-months at some point between her AOD on April 6, 2013, and August 26, 2020, the date ALJ Foresman issued her decision. Pl.'s Br. 20–22. She argues that the ALJ focused solely on evidence from the period after her conditions started to improve in finding Ceceli's mental impairments "non-severe" throughout the relevant time and in rejecting certain findings from Dr. Cousins's October 2014 MSS. *Id.* at 17–23. Ceceli asserts that the ALJ erroneously overlooked evidence that showed her mental impairments caused disabling limitations. *Id.* The record demonstrates Ceceli's mental impairments were at their worst from June 2014, when Ceceli first saw Rose, R. 1969–78, until February 2017, when she began reporting improvement, R. 1329. Nonetheless, relying primarily

on evidence from outside of this period, the ALJ concluded that Ceceli had no "severe" mental impairments at any time during the relevant period, without assessing whether she might be entitled to a closed period of disability. Considering the length of the relevant period at issue, and the significant evidence of Ceceli's mental impairments from June 2014 through February 2017, the ALJ should have analyzed whether Ceceli's RFC changed at various points during the relevant period and whether she should be entitled to a closed period of disability. *Cf. Jennings*, 2017 WL 1133424, at *6 ("[T]he opinion does not state whether the RFC finding . . . relates to Jennings's functioning during this period or after her abdominal issues had resolved, even though it is likely that her level of functioning would have been markedly different at these times."). Thus, remand is warranted. *See Puryear*, 2016 WL 462822, at *6 ("[T]he ALJ's analyses of the medical opinion and RFC do not expressly account for evidence indicating greater impairment before Puryear's surgery. Such an omission warrants remand.").

1. *Severity of Ceceli's Mental Impairments*

"An impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (cleaned up). "Ordinarily, this is not a difficult hurdle for the claimant to clear." *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 474 n.1 (4th Cir. 1999).

Here, ALJ Foresman concluded that Ceceli's medically determinable mental impairments of anxiety, personality disorder, bipolar disorder, PTSD, and depression "considered singly and in combination, [did] not cause more than a minimal limitation in [Ceceli's] ability to perform basic mental work activities," and thus were "non-severe." R. 905. To support this finding, the

ALJ determined that Ceceli had "no limitation" in any of the broad areas of mental functioning

known as the "paragraph B" criteria. R. 905–07. In reaching this conclusion, however, ALJ

Foresman relied almost entirely on evidence from either before Ceceli's mental impairments

clearly increased in severity, or after Ceceli began reporting improvement in her mental health

symptoms.

ALJ Foresman's evaluation of Ceceli's impairment-related limitations in social

interactions illustrates this point. *See* R. 906–07. In determining Ceceli was not limited in her

ability to interact with others, ALJ Foresman relied on Ceceli's reports that she got along with

friends, family, neighbors and others; dated and dined out at restaurants with the father of her

youngest child; attended class and obtained a PCA license; shopped in stores on a regular basis;

attended athletic events for her two older children; the fact that she got pregnant after her AOD;

and her status as sole caretaker for her three sons. R. 906. The ALJ also relied on Ceceli's

reported ability to drive on a regular basis, work as a caretaker for an elderly woman, ride in cars

with others, and get along with authority figures, as well as her mother's statement that Ceceli

woke up at 7:15 a.m. every morning to put her oldest child on the school bus. *Id.* Finally, ALJ

Foresman observed that Ceceli was "repeatedly" found to be alert and oriented, had normal

speech, made good eye contact, was cooperative and pleasant, and had good insight and

judgment. R. 906–07.

Aside from the examination findings, none of the evidence cited by the ALJ comes from

June 2014 through February 2017, despite the significant evidence in the record suggesting

Ceceli's mental impairments caused more than minimal limitations during that period. *See, e.g.*,

R. 1970 (crying episodes, irritability, extreme worrying, high anxiety, "mild" suicidal ideation)

(June 2014); R. 1964 (disorganized speech, depressed and anxious mood) (July 2014); R. 1506

(disheveled and poorly kept habitus, flat affect, appeared depressed) (Aug. 2014); R. 602

(disheveled appearance, flat and angry affect, labile mood, suicidal and homicidal thoughts)

(Sept. 2014); R. 1949 (disorganized speech, depressed and anxious mood, reports self-isolation)

(Apr. 2015); R. 1490 (ED visit after fight, reports feeling angry with family, suicidal thoughts)

(June 2015); R. 1446–48 (taken to hospital by family with suicidal and homicidal ideation,

jumped out of car on the way to the hospital) (Sept. 2016); R. 1327 (reporting mood problems

and emotional issues since April 2013 accident) (Dec. 2016). Ceceli began seeing Rose in June

2014, reporting that she had an "anger control problem," and that she did not want to be around

others. R. 1964. Relatively consistently, she reported anger control issues, anxiety, and

depression to Rose and other providers until at least February of 2017. *See, e.g.*, R. 584, 602

1953, 616, 1304, 1396–97, 1448, 1313. Further, during this period, providers assessed Ceceli

with feeling angry, R. 587; adjustment disorder with depressed mood, R. 587, 1404; generalized

anxiety disorder, R. 603, R. 887; depressive disorder, R. 603, 611, 617, 887, 1449, 1318, 1441,

personality disorder, R. 603, 1318; *see* R. 624; PTSD, R. 617, 887; and bipolar disorder, R. 624.

Moreover, during this timeframe, Ceceli often reported suicidal and homicidal ideation, *see, e.g.,*

R. 602, 616, 1448, 1441, 1491, 1954–55, 1967–68, and was admitted to in-patient psychiatric

services on at least three occasions for about a week each time, *see* R. 616, 1453, 1901–47, 1445.

    The ALJ did not explain why this evidence failed to show that Ceceli had "severe"

mental impairments and related limitations between June 2014 and February 2017. The ALJ's

analysis also did not acknowledge that the record plainly shows that Ceceli's mental impairments

were significantly more pronounced between 2014 and 2017 than they were in 2018. As such,

ALJ Foresman failed to build an "accurate and logical bridge" from the evidence to her

conclusion that at no point during the relevant period did Ceceli suffer from a "severe" medically

determinable mental impairment, and thus remand is warranted. *Woods v. Berryhill*, 888 F.3d

686, 694 (4th Cir. 2018); *see also Hancock v. Barnhart*, 206 F. Supp. 2d 757, 764 (W.D. Va.

2002) ("A district court will not . . . revisit the ALJ's resolution of conflicting evidence.

However, if the ALJ appears, without stating a reason, to have credited some probative evidence

over other evidence or to have ignored evidence altogether, a remand or reversal may be

necessary.").

       2.    *Analysis of Dr. Cousins's October 2014 MSS*

     Ceceli further contends that the ALJ erred in her evaluation of Dr. Cousins's October

2014 MSS. In determining a claimant's RFC, the ALJ will evaluate the medical opinion evidence

of record. For claims filed prior to March 27, 2017, "medical opinions" are statements from

"acceptable medical sources," such as physicians and psychologists, that reflect the source's

judgments about the nature and severity of the claimant's impairment, including her symptoms,

diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§

404.1527(a)(1), 416.927(a)(1). The ALJ must adequately explain the weight afforded to each

medical opinion in the claimant's record, taking into account relevant factors such as the nature

and extent of the source's treatment relationship with the claimant; how well he or she explained

or supported the opinion; the opinion's consistency with the record as a whole; and whether the

opinion pertains to the source's area of specialty. *Id.* §§ 404.1527(c), 416.927(c). A reviewing

court "must defer to the ALJ's assignments of weight" among differing medical opinions unless

his underlying findings or rationale "are not supported by substantial evidence" in the record.

*Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015); *see also Sharp v. Colvin*, 660 F. App'x

251, 257 (4th Cir. 2016).

ALJ Foresman's assessment of Dr. Cousins's October 2014 MSS does not meet these standards. Much of the evidence relied upon by the ALJ in assigning certain portions of this opinion "little weight" is not temporally related to Ceceli's condition at the time Dr. Cousins issued the opinion. For instance, ALJ Foresman assigned "little weight" to Dr. Cousins's finding that Ceceli would have difficulties accepting instructions from a supervisor or interacting appropriately with coworkers and the public. R. 920; *see also* R. 625. She reasoned that this finding was "highly inconsistent" with evidence demonstrating that Ceceli "works 30 hours a week, obtained a driver's license after her alleged onset date, drives to and from work, obtained a professional certification by attending an in person class and cares for three young children including a newborn," and that it was "not consistent with the medical evidence that shows that the claimant was repeatedly alert and oriented, had intact memory and was cooperative." R. 920.

Most of the events cited by the ALJ to discredit Dr. Cousins's October 2014 opinion did not occur until at least March 2017. Yet, the ALJ did not explain why evidence from 2017 or later undermined Dr. Cousins's opinion about Ceceli's abilities in October 2014—more than twelve months after her April 2013 AOD—to accept instructions from supervisors and interact appropriately with coworkers and the public. This error would be less significant if Ceceli's mental impairments had remained constant during the nearly seven years of treatment notes in the record, but, as discussed above, Ceceli's mental impairments improved after 2017.

Additionally, although Ceceli was often found to be alert and oriented and to have intact memory during the period from June 2014 through February 2017, the ALJ does not explain how this evidence is relevant to her ability to accept instructions from supervisors or engage in social interactions with coworkers and the public on a regular and continuing basis. *Cf. Lewis*, 858 F.3d at 869 ("The ALJ does not explain, for instance, how Lewis' normal gait bears any nexus to her

27

complaint of chronic shoulder pain."); *Brown v. Comm'r of Soc. Sec.*, 873 F.3d 251, 263 (4th Cir. 2017) ("[T]he ALJ provided no explanation as to how those particular activities—or any of the activities depicted by Brown—showed that he could persist through an eight-hour workday."). Ceceli's cooperation with medical providers may be relevant to her social functioning, but that evidence is conflicting. *See, e.g.*, R. 1970, 1964, 1506, 602, 1490. Moreover, the ALJ did not discuss whether seemingly probative evidence of Ceceli's psychiatric hospitalizations, her reports of suicidal and homicidal thoughts and self-isolation, and exam findings revealing depression and anxiety had any bearing on her social functioning. Thus, the ALJ failed to build an "accurate and logical bridge" from the evidence of record to her conclusion that Dr. Cousins's October 2014 finding in this regard was inconsistent with the evidence of record. *Woods*, 888 F.3d at 694; *see also Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) ("[T]he ALJ may not ignore an entire line of evidence that is contrary to the ruling, . . . . Otherwise, it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence.").

Accordingly, reversal and remand are warranted for the ALJ to consider all of the evidence from the entirety of relevant period, to consider whether the severity of Ceceli's mental impairments, or her RFC, changed during the relevant period, and to provide a logical explanation discussing relevant evidence to show how she reached her conclusions.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Ceceli's Motion for Summary Judgment, ECF No. 15, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 19, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 17, 2022

Joel C. Hoppe
United States Magistrate Judge